U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 FEB -1  PM 4: 35

CLERK

BY_____ (AW_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

GLENDA JIMMO, et al., )
)
Plaintiffs, )
)
v. ) Case No. 5:11-cv-17
)
)
SYLVIA MATHEWS BURWELL, Secretary )
of Health and Human Services, )
)
Defendant. )

## OPINION AND ORDER ADOPTING DEFENDANT'S CORRECTIVE ACTION PLAN AND MANDATING TWO ADDITIONAL REQUIREMENTS
(Doc. 111-114)

This matter comes before the court on the parties' submissions regarding the appropriate corrective action plan to be ordered in light of the court's conclusion that the Secretary breached the parties' Settlement Agreement. *See* Doc. 106 (August 17, 2016 Opinion and Order GRANTING IN PART and DENYING IN PART Plaintiffs' motion for resolution of noncompliance with the Settlement Agreement) (the "August 17, 2016 Opinion and Order"); *Jimmo v. Burwell*, 2016 WL 4401371 (D. Vt. Aug. 17, 2016).

Plaintiffs are represented by David J. Berger, Esq., Matthew R. Reed, Esq., the Center for Medicare Advocacy, Inc., and Vermont Legal Aid, Inc. The Secretary is represented by Assistant United States Attorney M. Andrew Zee, Assistant United States Attorney Steven Y. Bressler, and Special Assistant United States Attorney Tamra Moore.

I.   **Factual and Procedural Background.**

   A.   **The *Jimmo* Class Action.**

On January 18, 2011, six individual Medicare beneficiaries (the "Individual Plaintiffs") and seven national organizations (the "Organizational Plaintiffs") (collectively, "Plaintiffs") filed a class action suit in the District of Vermont against the Secretary, alleging, among other things, that the Secretary "impose[d] a covert rule of

thumb that operate[d] as an additional and illegal condition of coverage and result[ed] in the termination, reduction, or denial of coverage for thousands of Medicare beneficiaries annually." (Doc. 13 at 2, ¶ 1.) Plaintiffs alleged this covert rule of thumb improperly imposed an "improvement standard," whereby coverage for certain home health care services was denied if a beneficiary's condition had not improved (the "Improvement Standard"). *Id.* at ¶ 2. Plaintiffs further alleged that because of the Improvement Standard, Medicare contractors and adjudicators were denying Medicare coverage merely because a patient was unlikely to improve, or in retrospect failed to improve, even when the patient needed skilled care to maintain his or her condition or prevent or slow further deterioration.

The Secretary moved to dismiss Plaintiffs' claims on a number of grounds, including that they failed to allege a plausible ground for relief. The court granted the motion to dismiss in part and denied it in part. *See Jimmo v. Sebelius*, 2011 WL 5104355, at *1 (D. Vt. Oct. 25, 2011). Thereafter, without admitting liability or any wrongdoing, the Secretary agreed to settle Plaintiffs' claims in accordance with the terms and conditions of the Settlement Agreement. The court approved the Settlement Agreement at a January 24, 2013 fairness hearing under Fed. R. Civ. P. 23(b)(2).

### B. The Settlement Agreement.

Pursuant to the Settlement Agreement, the parties agreed to a "maintenance coverage standard" which provides that "[s]killed nursing services would be covered where such skilled nursing services are necessary to maintain the patient's current condition or prevent or slow further deterioration so long as the beneficiary requires skilled care for the services to be safely and effectively provided." (Doc. 82-1 at 13, § IX.7.a.) (the "Maintenance Coverage Standard").[1]

---

[1] To receive Medicare benefits for home health care services, a beneficiary must be: (a) confined to the home; (b) under the care of a physician; (c) in need of skilled services; and (d) under a plan of care. 42 C.F.R. § 409.42(a)-(d). "Nothing in [the] Settlement Agreement modifies, contracts, or expands the existing eligibility requirements for receiving Medicare coverage[.]" (Doc. 82-1 at 9, § IX.2.)

2

The Settlement Agreement required the Secretary to make certain revisions to the Medicare Beneficiary Policy Manual ("MBPM") to reflect the Maintenance Coverage Standard. In its August 17, 2016 Opinion and Order, the court concluded that the Secretary has fulfilled these obligations.

The Settlement Agreement also required the Secretary to "engage in a nationwide educational campaign" through the Centers for Medicare and Medicaid Services ("CMS"), and in this "Educational Campaign," "use written materials and interactive forums with providers and contractors, to communicate the [skilled nursing facility ("SNF")], home health, and [outpatient therary services ("OPT")] maintenance coverage standards and the [inpatient rehabilitation facility] coverage standards[.]" (Doc. 82-1 at 14, § IX.9.) The Settlement Agreement provided that although Plaintiffs' counsel would be consulted and could provide input, "CMS shall retain final authority as to the ultimate content of the written educational materials" and the "PowerPoint slides" used in the Educational Campaign. *Id.* at 16-17, §§ IX.12, IX.14.

The Settlement Agreement provides that the court will retain jurisdiction for thirty-six months after the conclusion of the Secretary's Educational Campaign to "enforc[e] the provisions of the Settlement Agreement in the event that one of the Parties claims that there has been a breach of any of those provisions[.]" *Id.* at 6, § VI.3.

On March 1, 2016, after complying with the Settlement Agreement's dispute resolution process, Plaintiffs filed a motion to enforce the Settlement Agreement. In support of their motion, Plaintiffs argued that the Secretary did not adequately disavow the Improvement Standard or disseminate the Maintenance Coverage Standard and that the Secretary's Educational Campaign was so confusing and inadequate that little had changed as a result of the *Jimmo* settlement. Among other things, Plaintiffs asked the court to require the Secretary "to carry out additional educational activities to address the inaccuracies and inadequacies of the original [Educational] Campaign." (Doc. 94-1 at 25.)

In its August 17, 2016 Opinion and Order, the court granted in part and denied in part Plaintiffs' motion to enforce, holding that:

3

> the Secretary failed to fulfill the letter and spirit of the Settlement Agreement with respect to at least one essential component of the Educational Campaign. Plaintiffs have provided persuasive evidence that at least some of the information provided by the Secretary in the Educational Campaign was inaccurate, nonresponsive, and failed to reflect the maintenance coverage standard.

(Doc. 106 at 18.)

Thereafter, the parties negotiated extensively at arms-length and in good faith to reach an agreed upon corrective action plan. When they were unable to reach a consensus, each party submitted a proposed corrective action plan accompanied by a memorandum explaining why the court should adopt the party's plan.

### C. The Proposed Corrective Action Plans.

#### 1. Plaintiffs' Proposed Corrective Action Plan:

1. *Jimmo* Webpage: CMS will develop and launch a webpage dedicated exclusively to the *Jimmo* Settlement and its implementation. The webpage would include, *inter alia*, a web portal to which questions could be submitted for consideration by CMS and a section of Frequently Asked Questions (FAQs), which would be updated on a scheduled basis.

2. Written Statements about *Jimmo*: A clear statement about the changes (not mere "clarifications") created by the *Jimmo* Settlement, including an explicit statement that the maintenance coverage standard is a change in policy and practice for providers and adjudicators and an announcement of a new "*Jimmo* webpage," would be transmitted to stakeholders immediately after initiation of the webpage. The same statement would appear at the beginning of the webpage.

3. Oral Statements at Open Door Forums: A statement similar to that in No. 2 above would be read at the beginning of at least eight Open Door Forums scheduled after the website was launched.

4. National Call: A new National Call for contractors and adjudicators would be held.

5. New Trainings: New trainings would be held for the staffs of Medicare Administrative Contractors (MACs) and Medicare Advantage Organizations (MAOs), for which plaintiffs' counsel would have the opportunity to review the training materials and to make suggestions about them and to listen in on the training.

6. Additional Monitoring: Monitoring of the corrective action plan would continue beyond January 2017 and would include in-person

4

meetings of counsel to review questions that have been raised and to develop appropriate new FAQs.

(Doc. 111 at 6-7.)

### 2. The Secretary's Proposed Corrective Action Plan:

1. CMS will disavow the application of the so-called "Improvement Standard" as improper under Medicare policy for the SNF, HH, and OPT benefits, while making clear that CMS has consistently denied the existence of such an "Improvement Standard." This disavowal would appear on the forthcoming *Jimmo* webpage and in the transmittal message notifying stakeholders of the webpage.

2. CMS is willing, through counsel, to notify Plaintiffs and the [c]ourt once the Technical Direction Letter and Health Plan Management System memorandum have been issued to, respectively, Medicare Administrative Contractors (MACs) and Medicare Advantage Organizations (MAOs).

3. CMS will publish on its website cms.gov a new webpage dedicated to the *Jimmo* settlement. The *Jimmo* webpage will, in one location, provide access to public documents related to the settlement that have been previously posted on the cms.gov website. In addition, the *Jimmo* webpage will direct providers and suppliers with questions regarding individual claims to the appropriate MAC. CMS will include at the top of the new *Jimmo* webpage a message about the settlement. This message will summarize the clarifications to Medicare policy that CMS has issued as part of the settlement. Once the *Jimmo* webpage is published, CMS will notify stakeholders of the webpage through existing communication channels and advise stakeholders seeking information about the settlement to visit the webpage. Before the new *Jimmo* webpage message is finalized, CMS will provide Plaintiffs' Counsel with a two-week period in which to provide comments on an advance version of the message. CMS will consider any comments received from Plaintiffs' Counsel.

4. CMS will post on the forthcoming *Jimmo* webpage one set of Frequently Asked Questions (FAQs). This document would be developed by CMS and would include multiple questions and answers regarding the policy clarification resulting from the *Jimmo* settlement. CMS will provide Plaintiffs' Counsel with an opportunity to suggest potential questions for inclusion in the FAQ posting, which CMS will consider but would not be bound to accept.

5. CMS will include a message regarding the *Jimmo* settlement when it announces the publication of the *Jimmo* webpage to providers, adjudicators, contractors, and other stakeholders.

5

6. CMS will clarify the responses in the document entitled "Summary of the questions posed and answers provided during the December 16, 2013 *Jimmo vs. Sebelius* National Call for contractors and adjudicators" to address the concerns identified by the [c]ourt in its August 17, 2016 Opinion and Order. CMS will disseminate the Clarified Summary to contractors and adjudicators using the same communication channels as were used for the original Summary. CMS will make clear to contractors and adjudicators that the information contained in the Clarified Summary supersedes the information contained in the original Summary. Before the Clarified Summary is finalized, CMS will provide Plaintiffs' Counsel with a two-week period in which to provide comments on an advance version of the Clarified Summary. CMS will consider any comments received from Plaintiffs' Counsel but would not be bound to accept them.

7. CMS will issue a Technical Direction Letter to MACs directing them to conduct, within a specified timeframe, additional training on the *Jimmo* manual clarifications. CMS would provide the MACs with materials for use in conducting this training.

8. CMS will issue a Health Plan Management System memorandum to MAOs requesting that they conduct, within a specified timeframe, additional training on the *Jimmo* manual clarifications. CMS would provide the MACs with materials for use in conducting this training.

9. CMS will disavow the application of the so-called "Improvement Standard" as improper under Medicare policy for the SNF, HH, and OPT benefits, while making clear that CMS has consistently denied the existence of such an "Improvement Standard." This disavowal would appear on the forthcoming *Jimmo* webpage and in the transmittal message notifying stakeholders of the webpage.

10. CMS is willing, through counsel, to notify Plaintiffs and the [c]ourt once the Technical Direction Letter and Health Plan Management System memorandum have been issued to, respectively, Medicare Administrative Contractors (MACs) and Medicare Advantage Organizations (MAOs).

(Doc. 112-1 at 3-4.)

## II. Legal Analysis and Conclusions.

The court's authority to enforce the Settlement Agreement is not unlimited. It cannot impose new obligations the parties have not bargained for, correct any disparity in bargaining power, or devise its own scheme for implementing the *Jimmo* settlement. The Secretary has offered to undertake certain educational activities beyond those required by the Settlement Agreement in order to correct the deficiencies the court found in the

6

Educational Campaign. Plaintiffs offer a more expansive list of educational activities and ask the court to order that certain obligations be continuing in nature. For example, Plaintiffs argue that CMS should be required to create a *Jimmo* webpage that is "dynamic, not static, with [P]laintiffs participating in the creation of FAQs and new FAQs as developments demand. A web portal for questions should be added to the webpage." (Doc. 114 at 7.) Plaintiffs were free to negotiate for this relief in the Settlement Agreement. No reasonable interpretation of the Settlement Agreement could be deemed to include it. It is therefore beyond the court's authority to require it.

Plaintiffs' suggestion that "additional training should not be left to the Secretary for her unilateral development; [P]laintiffs should be allowed to participate" warrants a similar response. *Id.* The court does not have the authority to order the Secretary to allow Plaintiffs to participate in her training. Provided the Secretary offers accurate guidance regarding the Maintenance Coverage Standard and affirmatively disavows the Improvement Standard, she retains the discretion to determine the content of the training she has agreed to undertake.

Finally, the court's jurisdiction over the Settlement Agreement does not extend to monitoring of indeterminate duration. It is therefore sufficient if the Secretary certifies the completion with the relief ordered herein. The court has considered each of Plaintiffs' remaining requests for corrective action and concludes that those requests require a different and more extensive Educational Campaign than the Settlement Agreement authorizes.

For the foregoing reasons, with the exceptions set forth, the court hereby ADOPTS the Secretary's proposed corrective action plan and ORDERS its completion on or before September 4, 2017. The court hereby ORDERS the Secretary's corrective action plan to including the following two additional requirements.

First, the parties agree that a statement disavowing the Improvement Standard and explaining the Maintenance Coverage Standard is an essential component of any corrective action plan. They have, however, been unable to reach a consensus as to the content of this statement. The Secretary's proposal that she draft a statement and then

7

solicit the non-binding comments of Plaintiffs' counsel is unlikely to resolve the parties' dispute as it merely replicates the negotiations that have prompted the current stalemate. Simply put, in light of the parties' dispute resolution history, the court finds little likelihood that the parties will reach an agreement as to the content of the corrective statement.

Plaintiffs propose a statement that is generally accurate. To date, Defendant has not pointed to any aspect of Plaintiffs' proposed statement that is either inaccurate or misleading. Instead, Defendant asserts only that "there is no need to include a subjective, history critique of allegedly 'erroneous' beliefs of certain providers, adjudicators, and contractors" and there is no need to "stray from the terms of the [Settlement] Agreement to introduce such undefined concepts as 'equal coverage' for so-called 'improvement and maintenance' care." (Doc. 113 at 7-8.) The court agrees with the latter contention and disagrees with the former.

The concept of "equal coverage" may add an element of confusion without clarifying whether and when the Maintenance Coverage Standard applies. It is therefore both unnecessary and potentially confusing surplusage. In contrast, the Secretary's disavowal of the Improvement Standard should be part of any corrective statement. Plaintiffs' proposed statement reflects this disavowal in non-inflammatory terms that accurately reflect the confusion over the use of the Improvement Standard which gave rise to their lawsuit. In their motion to enforce the Settlement Agreement, Plaintiffs persausively demonstrated that confusion over the Improvement Standard persists. In such circumstances, an affirmative disavowal of the Improvement Standard in an accurate historical context is warranted.

Accordingly, subject to Defendant's right to object within fourteen (14) days of this Order, the court hereby ADOPTS IN PART Plaintiffs' proposed statement as follows:

> The Centers for Medicare & Medicaid Services reminds the Medicare community of the *Jimmo* Settlement Agreement (January 2014), which clarified that the Medicare program will pay for skilled nursing care and skilled rehabilitation services when a beneficiary needs skilled care in order

8

to maintain function or to prevent or slow decline or deterioration (provided all other coverage criteria are met). Specifically, the *Jimmo* Settlement adopted a "maintenance coverage standard" for both skilled nursing and therapy services:

> Skilled nursing services would be covered where such skilled nursing services are necessary to maintain the patient's current condition or prevent or slow further deterioration so long as the beneficiary requires skilled care for the services to be safely and effectively provided.
>
> Skilled therapy services are covered when an individualized assessment of the patient's clinical condition demonstrates that the specialized judgment, knowledge, and skills of a qualified therapist ("skilled care") are necessary for the performance of a safe and effective maintenance program. Such a maintenance program to maintain the patient's current condition or to prevent or slow further deterioration is covered so long as the beneficiary requires skilled care for the safe and effective performance of the program.

The *Jimmo* Settlement may reflect a change in practice for many providers, adjudicators, and contractors, who may have erroneously believed that the Medicare program pays for nursing and rehabilitation only when a beneficiary is expected to improve. The Settlement correctly implements the Medicare program's regulations governing maintenance nursing and rehabilitation in skilled nursing facilities, home health services, and outpatient therapy (physical, occupational, and speech) and maintenance nursing and rehabilitation in inpatient rehabilitation hospitals for beneficiaries who need the level of care that such hospitals provide. These regulations are set forth in the Medicare Benefit Policy Manual.

(Doc. 111 at 8-9) (the "Corrective Statement"). The Corrective Statement shall be included on the *Jimmo* webpage, in the FAQs, and in the written materials and oral statements the Secretary has agreed to disseminate as part of her corrective action plan.

Second, because the Secretary's "Summary of the questions posed and answers provided during the December 16, 2013 *Jimmo vs. Sebelius* National Call for contractors and adjudicators" (the "Summary") (Doc. 94-15) gave rise to the court's determination that the Settlement Agreement had been breached, the errors in the Summary must be corrected. The Secretary argues that a corrected Summary will suffice. She further argues that, in light of the passage of time, a corrective national call will only increase

9

confusion. Plaintiffs counter that because the Summary merely highlights the erroneous information provided in the December 16, 2013 national call, a new and accurate national call should take place.

A transcript of the national call was not provided to the court. The court must therefore proceed on the assumption that the Summary reflects certain erroneous and misleading information provided by the Secretary in the national call. Based on this assumption, the court agrees that a corrected Summary will not cure the deficiencies in the national call. The court therefore ORDERS that, after providing at least fourteen (14) days' notice to Plaintiffs' counsel, the Secretary shall hold a national call in which the Corrective Statement is orally disseminated. Nothing precludes the Secretary from including other subject matters in the national call. Notice of the national call shall include the following statement: "This call will include corrective action mandated by the court overseeing the *Jimmo* settlement, clarifying the rejection of an improvement standard and explaining the maintenance coverage standard now included in the Medicare Beneficiary Policy Manual." Such notice will alleviate any potential confusion regarding the purpose of the national call.

In all other respects, the court finds that the Secretary's corrective action plan will cure its breach of the Settlement Agreement and fulfill its remaining obligations for an Educational Campaign set forth therein.

## CONCLUSION

For the foregoing reasons, the court hereby ORDERS the Secretary to implement her corrective action plan with the two additional requirements: (1) the inclusion of the Corrective Statement; and (2) a national call that includes the Corrective Statement and the notice required by the court. The Secretary shall certify compliance with this court's Order no later than September 4, 2017.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 1st day of February, 2017.

Christina Reiss, Chief Judge
United States District Court